BLANK ROME LLP
Jeremy J.O. Harwood
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-0208
Telephone: (212) 885-5000
Attorneys for Petitioner


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Arbitration Between:

SUNSKAR LTD., as Owner of the M/V
GEORGIA S,

               Petitioner,

   and

CD II TRADING INC., CHINA DIRECT
INDUSTRIES INC. d.b.a. CD II TRADING INC.,
as Charterer,

               Respondents.

11 Civ. 2499(DLC)

## MEMORANDUM OF LAW IN SUPPORT OF AMENDED PETITION TO APPOINT ARBITRATOR ON BEHALF OF RESPONDENT SUNSKAR LTD. AND COMPEL ARBITRATION

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

THE FACTS ......................................................................................................................2

ARGUMENT......................................................................................................................2

    1.    The Court Has Jurisdiction To Enter An Order Appointing An Arbitrator And Compelling Respondents It To Arbitrate    ...........................................2

    2.    Under Clear Maritime Precedent Friedberg's Agreement To "Main Terms" Created A "Fixture" Or The Charter ....................................................4

    3.    China Trading Cannot Hide Behind Friedberg's Alleged Inexperience And Lack Of Authority.............................................................................................5

        (a) Friedberg's "Inexperience" Does Not Equate to Lack Of Authority......................................................................................6

        (b) CDII'S Vice-President Was Not An Unauthorized Agent Without Actual Or Apparent Authority.............................................................................8

    4.    Sunskar Requests An Evidentiary Hearing If Needed...............................12

CONCLUSION.............................................................................................................13

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atlantic & Great Lakes S.S. Corp. v. Steelmet Inc.*,
565 F.2d 848 (2d Cir. 1977)..................................................................................5

*Great Circle Lines Ltd. v. Matheson & Co.*,
681 F.2d 121 (2d Cir. 1982)......................................................................4, 5, 6, 12

*Interocean Shipping Co. v. National Shipping & Trading Corp.*,
523 F.2d 527 (2d Cir. 1975)..........................................................................4, 11

*Karavos Compania Naviera S.A. v. Atlantica Export Corp.*,
588 F.2d 1 (2d Cir. 1978)..............................................................................9, 10

*Samsun Corp. v. Khozestan Mashine Kr Co.*,
926 F. Supp. 436 (S.D.N.Y. 1996) ................................................................11

*Stolt Tankers Inc. v. Marcus Oil & Chemical, et al.*,
2001 U.S. Dist. LEXIS 19750 (S.D.N.Y. Nov. 29, 2001) ......................7, 8

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
241 F.3d 135 (2d Cir. 2001)..........................................................................4, 12

STATUTES

9 U.S.C. § 4...............................................................................................12

134845.00602/7035356v.2

# INTRODUCTION

SUNSKAR LTD., as Owner, of the M/V GEORGIA S ("Owner") requests this Court issue an Order pursuant to Sections 4 and 5 of Title 9, United States Code, appointing an arbitrator on behalf of Respondents CDII TRADING INC. ("China Trading") and/or CHINA DIRECT INDUSTRIES INC. d.b.a. CD II TRADING INC., ("China Direct")[1] as Charterer, and compelling Respondents arbitrate Owner's claim arising under a contract of charter party dated on or about January 25, 2011 (the "Charter") in the captioned New York arbitration.

The original petition to compel China Direct to arbitrate was opposed by both companies, claiming to be separate corporations.

This amended petition raises the issue of (i) China Trading is obliged to arbitrate as the company that conducted the negotiations and as named in the Charter and (2) whether China Direct is bound to arbitrate because it had its "shipping arm" enter into the Charter, as its "doing business name." Throughout negotiations leading to the Charter, China Trading was held out to be the "doing business name" of China Direct.

Irrespective of the answer to the second question, China Trading is undeniably a party to the Charter and an order may be entered to compel it to arbitrate now, without further expenditure of time, legal and judicial resources and a "summary trial," while an assessment of the necessity of seeking, separately, to compel China Direct to participate and be joint and severally liable for any award can be made.

---

[1] China Trading and China Direct are referred to collectively, as "CDII."

1

## THE FACTS

The facts are fully supported by the Exhibits to the previously filed affidavit of Jeremy J.O. Harwood, sworn to on the 12th day of April, 2011 ("Harwood Aff."); Declaration of David Wold dated June 6, 2011 ("Wold Dec.") and Supplemental Declaration of Jeremy Harwood dated July 11, 2011[2] (the "Harwood Dec.").

## ARGUMENT

### 1.   The Court Has Jurisdiction To Enter An Order Appointing An Arbitrator And Compelling Respondents It To Arbitrate

Sections 4 and 5 of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, provide, in relevant part, as follows:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.

*   *   *   *   *   *

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, **or if for any other reason there shall be a lapse in the naming of an arbitrator** or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy **the court shall designate and appoint an**

---

[2] Exhibits to the respective declarations are referred to herein by their designated number.

> **arbitrator** or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C. § 5 (emphasis provided).

It is axiomatic that U.S. general maritime law does not require a charter party to be executed to create a binding contract. *See, Atlantic & Great Lakes S.S. Corp. v. Steelmet Inc.*, 565 F.2d 848 (2d Cir. 1977).

The Charter provides for New York arbitration. (Rider clause 16), *See*, Wold Dec. ¶ 43, Ex. 10.  Owner has appointed a New York commercial arbitrator.  Both China Direct and China Trading have refused to arbitrate. (Harwood Dec. Exs. 1-3).

The Court has personal jurisdiction over Respondents on the basis of their agreement to arbitrate in New York and "shall designate and appoint an arbitrator" on their behalf[3] and compel arbitration.   China Direct disputes the Court's personal jurisdiction over it because it claims that it is not the *alter ego* of China Trading.  This will be addressed, if necessary, by separate motion or petition.  It is, however, undisputed that China Trading in accepting the "main terms" of the Charter and New York arbitration, as discussed below, consummated the Charter and accepted thereby this Court's personal jurisdiction over it.  Indeed, Friedberg, despite initial reluctance from China Trading/Direct's general counsel Rothstein, who wanted a South Florida arbitration venue, told Wold on January 24, 2011 "we agree to arbitration in New York."

---

[3] The proposed order, attached to the amended petition, requests that the Court chose from the roster of the Society of Maritime Arbitrators Inc. (Harwood Aff. Ex. 1) three potential alternate arbitrators.

(Wold Dec. ¶54)  Accordingly, the Court has personal jurisdiction over China Trading. *See American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999) ("It is well-settled that federal courts applying New York law have personal jurisdiction over parties that agree to arbitrate their disputes in New York [citation omitted] . . . if the Owners are estopped [as one of the five theories of binding a non-signatory] from denying their obligations under the arbitration agreement . . . it follows that they are also estopped from asserting a lack of personal jurisdiction based on that agreement.")

## 2.   Under Clear Maritime Precedent Friedberg's Agreement To "Main Terms" Created A "Fixture" Or The Charter

The Second Circuit authority on the fixture (main terms)/details phases of charter party contract formation is well established.  The leading case is *Great Circle Lines Ltd. v. Matheson & Co.*, 681 F.2d 121 (2d Cir. 1982) which followed the precedent established by *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527 (2d Cir. 1975).  *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135 (2d Cir. 2001) reinforced the approach taken in this circuit and is binding on its admiralty courts.  As explained in *Great Circle Lines*:

> . . . charter parties are formed in two stages.  First, significant "main" terms are negotiated through brokers.  These terms usually include the name of the charterer, name of owner, ship, and its characteristics, time and place of delivery, duration of charter, place of redelivery, hire rate, printed form upon which the contract is based, and any other term that a party deems important.  These are considered the "bare-bones" of the contract.  The "main" terms when agreed upon are entitled a "fixture."  Second, after a "fixture" has been reached, the parties continue to negotiate "details"

4

amending the form contract specified in the "fixture." These minor or side issues "flesh-out" the original agreement or fixture.

681 F.2d at 125.

As shown in the Wold Declaration, there was a clear agreement to these terms plus the provision of a *pro forma* for details and, therefore, the completed Charter. After Friedberg had discussed the "fixture" with the "BIG GUYS" (Wold Dec. ¶59) he wrote, on January 25, 2011 "this is to confirm that CDII Trading agrees that all information regarding the five points ... is amended and correct ... [a]ny other terms in the charter party mentioned above have been agreed upon." (*Id.*, ¶68). (Wold Dec. ¶¶ 31-49, 55, 58, 68)

### 3.   China Trading Cannot Hide Behind Friedberg's Alleged Inexperience And Lack Of Authority

It is axiomatic that U.S. general maritime law does not require a charter party to be executed to create a binding contract. *See, Atlantic & Great Lakes S.S. Corp. v. Steelmet Inc.*, 565 F.2d 848 (2d Cir. 1977). CDII appears to think otherwise. As background, CDII claims that Alex Friedberg "a recent college graduate" was "asked by his employer to locate vessels." (CDII Brief at 9). CDII continues that Friedberg was "not given authority to bind the company to the hiring of a vessel or to sign off on a charter party." (CDII Brief at 10). CDII further states: "Friedberg was without authority, actual or apparent, to bind [China] Trading to a charter party." (*Id.*) The unprincipled basis for these assertions is highlighted by Friedberg's very diligent, and candid, discussions with Wold (over Skype) of his need to obtain authority from the CDII "team" or "BIG

5

GUYS," whom he identified as Andrew Goldrich (VP), James Wang (CEO), Lazarus Rothstein (VP, General Counsel). (Wold Dec. ¶¶ 50, 59). Only <u>after</u> that did he confirm agreement. (*Id.* ¶68).

### (a)    Friedberg's "Inexperience" Does Not Equate to Lack Of Authority

Friedberg makes much of his inexperience based upon which he claims "I had no authority to execute trades on behalf of [China] Trading." (Fr. Dec., ¶ 4). He claims he approached the "shipping stage," as he announced to Norden,[4] "somewhat naively" (*Id.*, ¶6) and that Wold "was helping to educate me in how the shipping business worked." (*Id.*, ¶8). He also claims, in an obvious attempt to suggest he was misled, that "[d]espite my inexperience" Wold suggest that "it would not be a good idea for me to show the [draft] contract to the [CDII] lawyers ..." (*Id.*, ¶16), despite Rothstein being one of the "team," from whom he sought approval.

Friedberg admits that on January 25, 2011 "we had finished negotiating most of the key points [main terms] of the agreement [Charter] ..." (Fr. Dec. ¶21). Contrary to the law in this Circuit and custom and usage of the industry, as had been explained to him, he asserts: "[n]one of this obviated the requirements I had repeatedly informed Wold I needed to fulfill before [China] Trading would be bound ..." (*Id.*)

Wold had explained the *Great Circle* "rules" at the outset. (*Id.*, ¶¶ 22, 39, 46). CDII has, in effect, offered up Friedberg as the alleged innocent led astray by a "highly experienced shipping owner's agent" (CDII Brief at 2) greedy for his commission. (*Id.* at

---

[4] He approached Norden stating "I represent China Direct Industries, Inc. ... we are approaching the 'shipping stage' of our project." (Wold Dec. ¶12, Ex. 5)

10).  Nothing could be further from the truth.  CDII and its officers were well aware of Friedberg's negotiations and it is striking that <u>none</u> of them, including Rothstein, have filed declarations to assert Friedberg's actions were unauthorized or without their knowledge or permission.  Exactly the same type of argument was raised and rejected by District Judge Chin in *Stolt Tankers Inc. v. Marcus Oil & Chemical, et al.*, 2001 U.S. Dist. LEXIS 19750 *8-9 (S.D.N.Y. Nov. 29, 2001).  There the respondent, "Marcus," claimed that an arbitration award should not be confirmed against it because it never entered into a charter with "Stolt" or agreed thereby to arbitrate.  Stolt had sent Marcus a "fixture recap" that also confirmed the use of a standard (ASBATANKVOY) charter party form (which contained the arbitration provision).  Judge Chin ruled:

> In alleging that it did not enter into any agreement to arbitrate, Marcus argues that it was ignorant of the customs and practices of the shipping industry and that it never intended to be bound to a charter party. Marcus contends that during negotiations with Stolt, "there was no mention whatsoever of the terms and conditions that were set forth in the fixture recap." (Hassan Aff. P 20).  Marcus repeatedly claims that it had "never been involved in any bulk ocean transportation before.  [It] had no knowledge of the ... business ... [It] did not know anything about a voyage charter nor what the term ASBATANKVOY would represent."
>
> Even if these factual assertions are accepted as true, Marcus's professed inexperience in bulk maritime shipping is not a defense.  Even if *"the rankest amateur decides to participate in an established commercial industry, he is as bound by the customs and practices of that industry as the most grizzled veteran."* [*Samsun Corp. v. Khozestan Mashine Kr Co.*, 926 F. Supp. 436, 440 (S.D.N.Y. 1996)].

*    *    *

7

Furthermore, it makes no sense that the parties would enter into a substantial transaction such as this one without agreeing on the principal terms, including how to resolve disputes. **Marcus is bound by the terms of the charter party because it admittedly received documents showing that it was so bound and it did nothing to dispute the documents. It did not take advantage of several opportunities to challenge both the existence and terms of the charter party before Stolt performed on the contract and shipped the goods. If Marcus disagreed with the fixture recap it could have and should have objected in writing.** If Marcus did not understand some of the terms, it could have inquired.  Finally, if the terms set forth in the fixture recap were not acceptable to Marcus, it could have simply declined to proceed with Stolt as its shipper.  Even assuming the terms were not discussed orally, the terms were set out in the documents that Marcus received and accepted.

(*Id.* at *9-10, emphasis added)

The case is indistinguishable.  Wold sent the completed Charter on January 24 (Wold Ex. 8); January 25 (Wold Ex. 9) and, by letter dated February 1, 2011 (Wold Ex. 10), he asked Alex to have it executed and returned.  Moreover, the Vessel sailed for Mexico with constant updates of her arrival (*Id.* ¶ 63) and there were numerous communications about loading the Vessel and finding more cargo to meet the minimum quantity under the Charter (*Id.* ¶¶ 69-72, 75-81).  Only on February 27 (when asked by Wold to return the executed Charter) did Friedberg state "I have no idea what you are talking about" (*Id.* ¶84).

### (b)   CDII'S Vice-President Was Not An Unauthorized Agent Without Actual Or Apparent Authority

Friedberg, clearly held himself out as the "point man" to complete the "shipping stage" of the "Manzanillo Project," even if this meant that he had to obtain approvals

8

from his superiors. CDII claims "Friedberg was without authority, actual or apparent, to bind [China] Trading ..." (Brief at 10). The only shipping agency case it cites, *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1 (2d Cir. 1978), is entirely inapposite. As stated by the Court "[t]he dispute is over the existence of the link between Atlantica [alleged charterer] and Resources [a trading company represented by Alfred Repetti] (or Repetti) necessary to bind Atlantica" to a charter party with Karavos. (*Id.*, p. 3) Atlantica, through its witness Tejuco, took the position that "Repetti was to provide shipping" but not that it was going to enter into a charter. (*Id.*, p. 9) The Court stated "Tejuco testified that Atlantica would pay the ship owner, but Judge Ward did not rely on this, and, even if he had, the fact that Atlantica was arranging to finance a suitable charter would not, in view of the other evidence and applicable burden of proof, support the findings of actual authority [in Repetti] to enter into a charter on Atlantica's behalf." (*Id.*). [5] The Court held that "[b]eyond this a strong inference must be drawn against Karavos from its failure to call Repetti" who had "every motive to contradict Tejuco if he honestly could." (*Id.*) The Court therefore rejected the Lower Court's finding of actual authority.

The Court also rejected the "finding of apparent authority [which] was based largely on Atlantica's having permitted Repetti to work in its San Francisco office and to receive telex' and make telephone calls." (*Id.*, p. 10) This did not justify a belief that

---

[5] At a meeting Tejuco also stated "that under no circumstances would Atlantica accept the position of charterer and he had not authorized Repetti or anybody else to place it in that position." (*Id.*, p. 9)

9

"Repetti was authorized to commit Atlantica to a costly charter, with many more to come, and relieved [the broker] of the duty of reasonable inquiry." (*Id.*) The court also rejected Kavaros' estoppel argument.

CDII has attempted to make Friedberg's actions and communications match those of both the unauthorized agent, Repetti, as well as those of the purported charterer's principal, Tejuco, who "emphatically stated" that "under no circumstances would Atlantica accept the position of charterer" (*Id.* p. 9). This attempt to have Friedberg play both roles is significant. It is clear, as stated above, that Friedberg consulted with and "cleared" agreement to "main terms" with the CDII officers, including the "BIG GUYS." (*See,* Wold Dec. ¶¶ 50, 59).

Moreover, Friedberg was not simply "borrowing" offices - he was a Vice President of China Trading working out of CDII's combined premises. (Wold Dec. Exs. 1 & 2). Although he advised Wold that he needed approvals, when he advised on January 25, 2011 "CDII Trading agrees that all information regarding the five [main details] of the Charter Party is amended and correct" and "[a]ll other terms in the charter party … have been agreed upon" this was <u>after</u> Friedberg had told Wold on January 24, 2011 "I sent the [charter] out to everyone on the team today" and identified that team as Goldrich, Wang and Rothstein. (Wold Dec. ¶ 53). The fact that none of those gentlemen had submitted evidence along the lines of Atlantica's Tejuco to the effect that CDII would under no circumstances enter into a charter is telling. Given Friedberg's stated concerns to obtain "team" approval, his failure to state what approval he sought, and from

10

whom, before advising "[a]ll other terms ... have been agreed upon" also invites an adverse inference. *c.f.* Fr. Aff. ¶ 21.

In *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 537 (2d Cir. 1975) the court considered a shipbroker's authority, which the Lower Court had gauged on "conduct, the relationship of the parties and **the custom of the industry**" to draw an inference of authorization. (emphasis added). The Second Circuit in affirming stated:

> . . . Agency is a legal concept which depends on the manifest conduct of
> the parties, not on their intentions or beliefs as to what they have done.
> Restatement (Second of Agency § 1, comment b (1958).

Here Friedberg's "wishful thinking" that unless and until CDII "superiors approved and signed an agreement" (Fr. Aff ¶ 11) he could (1) "agree" to all main terms and (2) arrange for a vessel to sail to Mexico to pick up a cargo, (3) that may or may not be available even if the vessel met her "laycan" dates was not simply naïve but would also, if necessary, meet estoppel standards for Sunskar's reliance on that agreement and its consequent entering upon performance thereof. That equitable doctrine does not have to be invoked because of the custom of the industry, declared unequivocally by the Second Circuit, by which the "rankest amateur" is as bound "as the most grizzled veteran." *Samsun, supra.*[6]

---

[6] *See also* Lord Justice Staughton in "Interpretation of Maritime Contracts" published in "The Healy Lectures 1992-2002" J.D. Kimball (ed) (Lloyd's 2005), p. 43: ... ("The outsider, who concludes a charterparty without ever having seen one before in his life, is rare. **We can spare no sympathy for him: he must be taken to be a familiar with the market as all other operators in it.**" [emphasis added])

11

Friedberg was told the *Great Circle* "rules" by Wold back in November 2010. (Wold Dec. ¶ 19). He and the CDII "team" cynically choose to ignore them **and** the fact that in reliance Sunskar had cancelled an existing charter and sailed its ship to Mexico to fulfill the Manzanillo Project.[7]   Clearly CDII thought they could walk away for lack of signature; they are wrong.

### 4.   <u>Sunskar Requests An Evidentiary Hearing If Needed</u>

"When the parties disagree about whether they entered into an arbitration agreement subject to the FAA, the FAA directs that the 'Court shall proceed summarily to … trial' of the issue. 9 U.S.C. § 4." *U.S. Titan, Inc.*, 241 F.3d at 145.  To the extent this Court does not find that the Wold Declaration and its exhibits evidence (1) an agreement to New York arbitration and (2) "main terms" of the Charter, Sunskar respectfully requests an opportunity for discovery and in order to depose Friedberg, and the "team" or "BIG GUYS" to whom he reported and, thereafter, an evidentiary hearing. c.f. *Stolt Tankers Inc.   Id.* at *8 ("Although Marcus seeks an evidentiary hearing, no hearing is necessary because even assuming Marcus's factual assertions are true, as a matter of law the charter party here is enforceable.")

---

[7]   Unless the charterer is in repudiatory breach the owner is obliged to present the vessel "ready to load" at the designated loadport within the "laycan" window to trigger the charterer's obligation to provide the cargo.

## **CONCLUSION**

Petitioner respectfully requests that this Court grant the amended petition and appoint three alternate arbitrators on behalf of Respondents China Trading and/or China Direct d.b.a. China Trading and then to proceed in the New York arbitration in accordance with the terms of the Charter and grant such other and further relief as may be equitable.

Dated: New York, New York
      July 11, 2011

                          Respectfully submitted,

                          BLANK ROME LLP
                          Attorneys for Petitioner Sunskar Ltd.

                      By: /s/ Jeremy J.O. Harwood
                         Jeremy J.O. Harwood
                         The Chrysler Building
                         405 Lexington Avenue
                         New York, NY 10174-0208
                         Telephone: (212) 885-5000

13