```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
                                          :
In the Matter of the Arbitration Between: :
                                          :
SUNSKAR LTD., as Owner of the M/V         :
Georgia S,                                :   11 Civ. 2499 (DLC)
                    Petitioner,           :
                                          :   OPINION AND ORDER
                                          :   ──────────────────
              -v-                         :
                                          :
CDII TRADING, INC., CHINA DIRECT          :
INDUSTRIES INC. d/b/a CDII TRADING, INC., :
as Charterer,                             :
                    Respondents.          :
                                          :
------------------------------------------X
```

APPEARANCES:

For petitioner:
Jeremy O. Harwood
Blank Rome LLP
405 Lexington Avenue
New York, New York 10174

For respondents:
Peter R. Porcino
Benjamin Sahl
Cowan, Liebowitz & Latman, P.C.
1133 Avenue of the Americas
New York, New York 10036


DENISE COTE, District Judge:

      Petitioner Sunskar Ltd. ("Sunskar") brings this action to

compel CDII Trading, Inc. ("CDII") and China Direct Industries

Inc. ("China Direct") to arbitrate pursuant to a charter party

(the "Charter Party") it purports to have made with the

respondents on or around January 23, 2011.  Sunskar brought this

                                  1

motion to compel arbitration pursuant to 9 U.S.C. § 4 on July 13, 2011.  The motion was fully submitted on August 4.

BACKGROUND

I.   The Parties

The following facts are undisputed unless otherwise noted. Sunskar is an owner of the M/V Georgia S ("Georgia"), a self-discharging vessel.  China Direct is a Florida corporation located in Deerfield Beach, Florida.  CDII is also a Florida corporation based in Deerfield Beach.  As CDII is a subsidiary of China Direct, they are distinct legal entities.  The website of CDII says that it "acts as the industrial goods sourcing and distribution arm for the CDII family of industrial companies," and names it a "trading division."  China Direct and CDII share the same offices and executive officers.  The chief executive officer of both companies is Yuejian J. (James) Wang ("James Wang"); the chief financial officer and executive vice president is Andrew X. Wang ("Andrew Wang"); the general counsel and executive vice president is Lazarus Rothstein ("Rothstein"); and the vice president is Andrew Goldrich ("Goldrich").  Two other vice presidents of CDII are Seth Berkowitz ("Berkowitz") and Manuel Perez ("Perez").

II.  Negotiations for an Ore Shipment Begin

Alex Friedberg ("Friedberg") is currently the Vice

President for International Logistics of CDII.  He graduated from the University of Florida in May 2010 and is relatively inexperienced in transportation procurement.  He was hired by CDII as an intern after graduation, given a consulting contract in October 2010, and then given his current title in December 2010.  The fact that he is a CDII employee was noted in his email correspondence at issue in this case.

In late 2010, Friedberg was tasked with finding transportation for a quantity of ore CDII intended to purchase from Mexico and deliver to China (the "Ore Shipment").  As part of this process, he came in contact with David Christian Wold ("Wold"), vice president of Skaarup Shipping International Corp. -- a ship owners' agent.  For the purposes of the Ore Shipment, Skaarup was an agent of Sunskar.  Wold and Friedberg had many conversations between December 2010 and February 2011 discussing transportation arrangements for the Ore Shipment.  These communications largely took place over email and using the instant messaging service of Skype.[1]  Wold claims that during these communications, Friedberg made clear that CDII was the "shipping arm" of China Direct.  In at least one email, Friedberg stated that he represented China Direct, although this

---

[1]   The respondents do not contest that the Skype instant message transcript submitted as an attachment to Wold's Declaration by Sunskar is complete and accurate.  In fact, the respondents refer to it as the "full copy" and cite to it in their opposition brief.

email also specified that CDII was a wholly owned subsidiary of China Direct and that Friedberg was an employee of CDII. Throughout these communications, Wold instructed Friedberg on terms and customs of the shipping industry and answered questions put to him by Friedberg about how shipping contracts are made.  Friedberg admits that during these communications with Wold, they "ironed out most of the terms on the business deal I thought were necessary," but alleges that he "was not authorized to bind CDII" and that CDII would not be bound until his superiors approved and signed any charter party.[2]  Friedberg also claims that during these conversations, he made Wold aware of CDII's difficulties in securing a sufficient quantity of ore to ship.

In December 2010, Wold identified the Georgia as a ship which could convey the Ore Shipment.  On December 20, Friedberg indicated he was very interested in the Georgia.  On January 10, 2011, Wold asked Friedberg if he should "develop with georgia s or should find alternative vessel/owners"?  Friedberg responded that he "would love to develop with Georgia," but that he needed to confirm that the receiver of the Ore Shipment had facilities

---

[2]    "A charter party is a contract by which an entire ship or some principal part thereof is let to a merchant.  The term 'charter party' actually refers to the document in which the terms and conditions of the lease of a vessel by an owner to a charterer are set out."  U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 138 n.1 (2d Cir. 2001).

to accept a self-discharging vessel like the Georgia.

III. Main Terms Are Agreed to on January 18-21, 2011.

By January 18, Friedberg had learned that the receiver could accept the Georgia.  Later that day, Wold asked if Friedberg were ready to book the Georgia, and Friedberg said that he was "very ready" but needed to wait a few hours. Friedberg then asked Wold if he was comfortable moving ahead even though only a certain quantity of ore -- 60% of the amount intended to be shipped -- was already at the "patio," the location where the Ore Shipment was being collected in Manzanillo, Mexico, the port city ("Manzanillo").  Wold said that he was comfortable, given that production over the next 30 days could provide the remaining ore.  Friedberg replied, "ok," and that they would start on the paperwork for the Georgia the next day.

On January 19, Friedberg asked Wold what the consequences would be if he committed to the Georgia but a problem with the shipping schedule arose.  Wold replied that if there were a cancellation, Sunskar would claim a loss if they could not find alternative cargo.  Friedberg then asked for the main terms of the charter, and Wold listed the charterer, cargo quantity (25,000 mt), load and discharge ports, the dates that the Georgia would be ready for loading at Manzanillio (February 15-25, the "Laycan Dates"), the loading rate, freight rate,

5

commission, and demurrage rate.  Wold noted that further details would be included in a charter party.  Friedberg and Wold also discussed payment options.  Throughout the conversation, Friedberg indicated his assent, saying "I accept" to the demurrage rate, that he could "confirm [the freight transfer] for you right now," that "yes we can do" the price and quantity terms Wold listed, and that "it is a GO" if the payment can be made due five days after signing and releasing the bill of lading.

During the afternoon of January 20, Friedberg confirmed with Wold that a form contract would be the basis for the details in the charter party, and told him that "I just spoke with the General Counsel about the whole shipping thing and we are ready to move forward, granted that you can move forward with the limited info that I have."  Wold replied, "sure, we can base it on that standard form and add any terms for [the loading port]."  Friedberg then made clear to Wold that he still needed to get a draft passed to the trading team and general counsel for final review.  Wold explained where he saw their negotiations at that point: "so we have fixed what we call 'main terms' and 2nd part is 'rider clauses' -- main terms are agreed so that its [sic] 'booked' and then best efforts from both sides are made to take their time to clean/add on rider clauses." Friedberg did not respond directly to this message.  Later, Wold

asked Friedberg, "so its [sic] time to be straight and clear . . . terms we agreed on y[ester]day, are they acceptable by cdii trading ic today?" Friedberg said "yes, except for fact that cargo might go to another potential port." They then exchanged copies of the riders and discussed how edits could be made to them. Friedberg told Wold, "trust that I've informed everyone in the office that reverting the [form contract] back to you, along with everything you request, is a PRIORITY."

Wold then reminded Friedberg "just have in the back of your head . . . in shipping there is a contract even if its [sic] not signed. Charter party details are based on the rule that both parties would try their outmost [sic] to reach an agreement on these commercial ruls [sic] after main terms have been agreed." Friedberg said that he "understood" and knew that they "are not playing a little game here." Wold replied, "price and main terms you have already carved in stone so not much we can do." Friedberg said, "great."

On January 21, Friedberg informed Wold that he would get him a full set of comments on the charter party and riders later that day, but that he would not be able to have the charter party signed until the next week. Wold replied that a signature was not necessary, as an oral contract was sufficient. In response to Friedberg's questions about possible failures in the supply of the ore, Wold told him that clauses in the charter

party would cover the resolution of any such issues.  Friedberg then asked what the latest time CDII could "back out without being penalized."  Wold's response was "back out?  Are you kidding? . . . I am speachless [sic]."  He asked if anyone at CDII had experience with force majeure clauses.

Discussion of charter party details resumed after that, and Friedberg sent Wold a draft of the form contract that afternoon. Wold noted that the proposed revisions in the draft called for arbitration in Guadalajara, and suggested arbitration in New York instead.

IV.  Agreement to Further Terms on January 24, 2011

The next business day was Monday, January 24.  Wold expressed a desire to get final agreement to all remaining terms that morning, and Friedberg mentioned that because some of the senior executives were in meetings, this could be difficult. Wold listed three items -- demurrage, arbitration location and letter of indemnity -- that he believed were still outstanding. Friedberg agreed those were outstanding.  Friedberg later confirmed agreement on demurrage and the letter of indemnity. Just before 1:00 p.m., Wold asked if all other terms had been agreed other than the location for arbitration.  Friedberg said that they had.  About an hour later, Friedberg confirmed that they agreed to arbitration in New York.  Wold emailed Friedberg a revised the charter party reflecting their discussions.

Sometime on January 24, Wold conveyed the status of the
negotiations to Sunskar, and the Georgia was taken off of its
active charter so that it could reach Manzanillo by the Laycan
Dates.

V.   Friedberg Tells Wold He Received Final Approval from the
     Senior Executives.

That evening, Friedberg told Wold that he sent the Charter
Party to "the team," whose collective input he would need and
hoped to have by the next morning.  Wold asked "are we missing
somebody onboard"?  Friedberg explained that the executives
whose input he would need –– Goldrich, Jason Wang and Rothstein
-- had not yet read the Charter Party.  Wold explained "you
would have to explain to them how it works . . . the vessel is
already 'on your account' . . . we have instructed her after
this voyage from Halifax to proceed to Manzanillo for loading
15-25 feb."  Friedberg responded, "all I can say is 'ok,'" and
agreed when Wold said that he "knew where it stands."

On January 25, Friedberg told Wold that he had spoken to
Goldrich, James Wang and Rothstein and that one had reviewed the
deal, and liked it, but that the others had not reviewed it.  He
stated that he did not think a signature would be coming that
day.  Wold reiterated that a signature was not necessary, just a
confirmation on the final draft from Friedberg would be
sufficient.  Friedberg responded that he could not provide

confirmation until Goldrich, whose title was vice president, had reviewed the charter party.  Wold told him that "there is nothing like 'little more time' when things have been agreed." Friedberg replied, "no comment."

Wold sent the final version of the Charter Party to Friedberg again at 5:46 pm that afternoon.  The Charter Party, dated January 25, names CDII as Charterer.  Clause 19(b) of the Charter Party states that

> [T]his Charter Party shall be governed and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons in New York . . . in accordance with the rules of the Society of Maritime Arbitrators.

Friedberg informed Wold that he would be speaking with the "VP" about the Charter Party.  Shortly thereafter, at 6:22 pm, he wrote, "David, this is to confirm that CDII Trading agrees that all the information regarding the five points of the Charter Party is amended and correct.  The Georgia-S Charter Party Laycan February 15th-25th, 2011 of course.  All other terms in the charter party mentioned above have been agreed upon."

VI.  Hints of Troubles with CDII's Procurement of Ore Arise.

On January 27, Wold sent a message to Friedberg asking for an immediate clarification, as either Sunskar or Skaarup had been told that the Georgia should delay its arrival because the

10

Ore Shipment would not be ready for loading at the beginning of
the Laycan Dates.  Friedberg agreed to help clarify things for
Wold, and to relay a message to his Mexican contact to "get IN
LINE."  But a few minutes later, Friedberg said that "if current
supplier falls short, another option is to say sorry Skaarup, no
can do."  Friedberg then apologized that it seemed he was taking
his frustration out on Wold.  Wold responded, "I will report to
[Sunskar] that all is well."  Friedberg replied, "ok."

Although Wold and Friedberg had communications on other
deals and about personal matters on January 28, the Ore Shipment
and Charter Party were not discussed.  The next time they
communicated about the Ore Shipment was on January 31, when
Friedberg warned Wold that CDII would be able to take advantage
of a possible early arrival of the Georgia at Manzanillo, and
that they were behind schedule procuring the full 25,000 mt of
ore for the Ore Shipment.  Wold responded with suggestions about
other sources for ore and with a roster of the ships as they
would be coming to the port at Manzanillo.  No part of the
conversation suggested that the timing of the ship or the slow
rate of ore procurement would pose a serious problem for the Ore
Shipment.

VII. CDII and Skaarup Attempt to Solve CDII's Ore Procurement
     Problems Between February 1 and February 9.

On the afternoon of February 1, Friedberg informed Wold

that Jason Wang had returned to the office, after having been in China for more than three weeks caring for his mother. Friedberg reported that Jason Wang was not comfortable with the slow rate of ore procurement and so wanted to "not fix the vessel."  Wold told Friedberg to get Jason Wang on the line since "he clearly is unaware of what has been committed and fixed."  Later that afternoon, Friedberg sent Wold an email indicating that CDII was attempting to find "another client to fill up the Georgia" so that the total ore would meet the required amount and that they were still trying to determine if they could "miraculously" "meet the [ore quantity] deadline by the 25th of February," the last Laycan Date when the Georgia was scheduled to be at Manzanillo.  Wold said that further efforts were being made by Berkowitz in Manzanillo "on matters paramount to our deal," and that they understood that "the Georgia-S is still on her way to Mexico, empty."

     Wold attempted to contact Friedberg the night of February 1 and the morning of February 2, but did not receive a response. On the afternoon of February 2, Friedberg informed Wold that he was having difficulty getting updates on the procurement of ore at the Mexican port, but that "we are working with other suppliers and there is a good chance that we can have one of them fill up the remaining holds so that we can reach our quota . . . minimum in charterer's option."  But, Friedberg then said,

with the [Charter Party], I explicitly stated and (you
surely could tell by my tone of voice) that I do not
desire to COMMIT or FIX and what is the last day I can
CANCEL.  By the language I used and by the honesty is
[sic] my words, you should have realized that we were
in no position to "FIX" a vessel

Wold responded, "we dragged that out to finally you where [sic] was a point of we loosing [sic] money or you commit, that happen [sic] on 25th and you commited [sic]."  Friedberg did not respond to this statement.

Friedberg and Wold spoke on February 3 and 4 about ways in which CDII could find more ore in Mexico that could fulfill the minimum requirement for the Ore Shipment.  During this conversation, Friedberg referred to looking at the "CP" for details about the port agent.

Wold informed Friedberg he would be traveling to Manzanillo and would like to meet with Berkowitz there.  In an email with the subject line "mv georgia s/acct cdii," Friedberg informed Wold that they would not be ready to load before February 13.  On the afternoon of February 8, Wold met with Berkowitz in Manzanillo and was given a tour of the patio where the Ore Shipment was stored.  Wold reported back to Friedberg and to Skaarup that the meeting had gone well.  Wold testified that Berkowitz had not informed him there was a chance CDII might not perform under the Charter Party.  Wold's email to Skaarup said that Berkowitz "reassured me that they would not run away from

13

the commitment due to financial reasons" and that he had spoken with Friedberg by phone, who said that "he hopes by tomorrow they would be able to say if they would ship their own or go for more or less full cargo from other suppliers." The respondents have not submitted any evidence contradicting this report.

Between February 8 and 11, Wold and Friedberg continued to communicate about possible other sources of ore that CDII could load onto the Georgia. Friedberg did not mention during this period that CDII might not be able to (or might not choose to) load anything onto the Georgia. On February 9, Wold informed Friedberg that by 11:00 a.m. on February 11, CDII would need to decide if it could load the Georgia S on the earlier Laycan Dates, so that the Manzanillo port authorities could schedule it for a terminal -- otherwise, it would be loaded during the later Laycan Dates. That same day, Ross Friedman ("Friedman"), the Vice President of Commercial Trading for China Direct, emailed Friedberg to ask for statistics about the Georgia for a "DD Report."

Also on February 9, Friedberg sent a purchase order for iron ore to be included as part of the Ore Shipment to Pacific Crest International, Inc. (the "Pacific Crest Order") on behalf of CDII. Goldrich, as "Vice President, Operations" was listed where CDII would sign the Pacific Crest Order. Wold also forwarded to Pacific Crest a noncircumvention/confidentiality

agreement ("NCCA") regarding the Pacific Crest Order on China Direct letterhead.  The NCCA listed China Direct as the "interested party" to the Pacific Crest Order.  CDII was not named in the NCCA.

VIII. CDII Stops Cooperating With Skaarup and Sunskar.

The next business day, February 14, Friedberg did not respond to any of Wold's messages seeking an update on the Ore Shipment.  On February 15, the first Laycan Date, Friedberg responded only to say that he did not have any updates.  Wold told Friedberg he was concerned as he had not heard from them, and the loading facility was at that point already booked for several days.

Friedberg continued to have no updates for Wold on February 16, except to say that one of Berkowitz's two meetings with alternate suppliers in Manzanillo had been unsuccessful.  He did not respond to Wold's suggestion that with the rise in prices of iron ore that year, it was possible that Sunskar could agree to sail the Georgia with only the amount of the Ore Shipment that CDII had collected thus far, without more.  Wold emailed Goldrich a copy of the Charter Party that afternoon.  According to a later email that Wold wrote, Goldrich called him on February 16 to let him know that "CDII is working on it."

On February 17, Wold emailed Jason Wang, explaining that while he understood CDII's difficulties in breaking into a new

market, he had tried to assist CDII by putting it in contact with alternate suppliers of ore and by obtaining an agreement from Sunskar to lower its agreed-upon price in case CDII was not able to procure the minimum amount of ore contemplated in the Charter Party.  He noted that he had even traveled himself to Manzanillo.  He noted that his efforts had not led to any response from CDII, and that despite the start of the Laycan Dates, CDII had as of yet failed to inform him what were the prospects of CDII loading the Ore Shipment onto the Georgia.

That day, Wold was told by CDII's agents that CDII has asked that the Georgia be taken off the port's schedule for loading.  Friedberg did not respond to Wold by instant message to provide any explanation for this action.

IX.  Sunskar Informs CDII That Non-Performance Constituted a
     Breach of the Charter Party.

On February 18, Wold emailed Goldrich, Berkowitz, Friedberg and Friedman Sunskar's position about the status of their agreement -- that any refusal to perform would be a breach of the Charter Party, and that the parties could either come to a mutual agreement to cancel the Charter Party or Sunskar would attempt to mitigate damages, bring a claim, and seek arbitration if necessary.  Goldrich emailed Wold to delay the time for a telephone conversation, with a form signature stating he was Vice President of China Direct.

16

The Skype records show that Friedberg did not respond to Wold's messages between February 17 and February 28.  On February 28, Friedberg claimed to Wold that he had "no idea" what Wold was talking about when Wold asked for a copy of the signed Charter Party.  Wold never received a copy of the Charter Party signed by China Direct, CDII, or any officer or agent of either corporation; Rothstein and Friedberg claim it never was signed.

On March 7 and March 21, 2011, Sunskar, through its counsel, sent a notice to China Direct, informing it that because China Direct had refused to comply with its obligations under the Charter Party, Sunskar was demanding that the dispute proceed to arbitration.  Sunskar further stated in its letters that China Direct's failure to appoint an arbitrator would lead it to file an action seeking an order compelling arbitration.

On April 4, 2011, Friedberg sent Wold a press release posted on "The Street" which stated that China Direct had completed delivery of iron ore from Mexico to China.  Friedberg indicated this was the same Ore Shipment as had been discussed for transport on the Georgia.  Also on April 4, and over several days up to April 13, Friedberg began negotiations with Wold concerning CDII's need for transportation for other, unrelated shipments.

On Sunskar filed this action on April 12, 2011, and a motion

17

to compel China Direct to arbitrate was filed April 27.  That
motion was fully submitted June 6.  At an initial pretrial
conference, Sunskar was permitted to amend its petition and file
a new motion to compel both CDII and China Direct.  Sunskar
filed its amended petition on July 13, but cited as its basis
for its petition against China Direct only that it was "doing
business as" CDII.  China Direct stated that it "reserved its
right" to file a new petition to compel China Direct on an alter
ego theory.  By Order dated October 13, Sunskar was permitted to
amend its petition for the purposes of asserting a theory of
alter ego liability against China Direct.  Sunskar declined this
opportunity to amend its petition in a letter October 14.


DISCUSSION

I.   Standard of Review

     The Federal Arbitration Act, 9 U.S.C. § 1 <u>et seq.</u> ("FAA"),
is "an expression of a strong federal policy favoring
arbitration as an alternative means of dispute resolution."
<u>Ragone v. Atl. Video at Manhattan Ctr.</u>, 595 F.3d 115, 121 (2d
Cir. 2010) (citation omitted).[3]  "[W]hether parties have agreed

---

[3]     The FAA does not "independently confer subject matter
jurisdiction on the federal courts." <u>Durant, Nichols, Houston,
Hodgson & Cortese-Costa P.C. v. Dupont</u>, 565 F.3d 56, 63 (2d Cir.
2009) (citation omitted).  "Thus, there must be an independent
basis of jurisdiction before a district court may entertain
petitions under the Act." <u>Id.</u> (citation omitted).  In <u>Vaden v.</u>

to submit a particular dispute to arbitration is typically an issue for judicial determination." Granite Rock Co. v. Int'l B'hood of Teamsters, 130 S. Ct. 2847, 2855 (2010) (citation omitted).  "When deciding whether the parties agreed to arbitrate a certain matter courts generally should apply ordinary principles that govern the formation of contracts." Id. at 2856 (citation omitted).

In the context of motions to compel arbitration brought under the FAA, 9 U.S.C. § 4, unless the parties have unambiguously provided for an arbitrator to decide questions of arbitrability, it is for courts to decide whether the parties agreed to arbitrate the claims at issue.  Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 406 (2d Cir. 2009).  "If there is an issue of fact as to the making of the agreement for arbitration, then a trial [on that issue] is necessary." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003).  In addressing such disputes, the courts apply a standard similar to that applicable for a motion for summary judgment.  Id.  "A party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in

Discover Bank, 129 S. Ct. 1262 (2009), the Supreme Court held that under § 4 of the FAA, federal courts have jurisdiction to hear a petition to compel arbitration so long as the underlying dispute between the parties "arises under" federal law.  Vaden, 129 S. Ct. at 1273.  Because Sunskar's claim "arises under" admiralty law, federal subject matter jurisdiction exists in this case.  28 U.S.C. § 1333(1).

support of [its] claim in order to precipitate the trial contemplated by 9 U.S.C. § 4." Manning v. Energy Conversion Devices, Inc., 833 F.2d 1096, 1103 (2d Cir. 1987). "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995). "[W]here the parties contest the formation of an agreement, any silence or ambiguity about whether such a question is arbitrable reverses the usual presumption that issues should be resolved in arbitration's favor." U.S. Titan Inc., 241 F.3d at 146 (citation omitted).[4]

   To determine whether all or part of an action should be sent to arbitration, the Court must consider: (1) whether the

---

[4]   The standard on summary judgment for determining whether there is a dispute of material fact is therefore relevant here. When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot "merely rest on the allegations or denials" contained in the pleadings. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).

parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration.  JLM Industries, Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir. 2004).  Here, as Sunskar has only a breach of contract claim, the third and fourth issues are not relevant.  Furthermore, the respondents do not dispute that, if there was an agreement to arbitrate, this dispute about the alleged charterer's performance under the Charter Party would fall within the scope of that agreement.  Therefore, only the first issue, whether the parties agreed to arbitrate, must be considered.

Although the respondents request a trial on this issue, one is not necessary.  The undisputed evidence shows that CDII and Sunskar formed a Charter Party;[5] that the Charter Party includes

---

[5]    The respondents contend that this Court need not decide if there was a binding Charter Party, as that determination should be left to any arbitrators if they are compelled to arbitrate. But the alleged agreement to arbitrate was a part of the Charter Party, so the existence of a binding Charter Party is a prerequisite to finding a binding arbitration agreement.  The case they cite, Northern Tankers Cyprus Ltd. v. Lexmar Corp., 781 F. Supp. 289 (S.D.N.Y. 1992), concerned an agreement to arbitrate which was separate from the alleged charter party at issue in that case.  Id. at 290-91 & n.3.  In contrast, here, as in Interocean Shipping Co. v. National Shipping & Trading Corp., 462 F.2d 673 (2d Cir. 1972), a vessel owner is seeking to compel alleged charterers to arbitrate a dispute arising from nonperformance of obligations under a charter party which

an agreement to arbitrate any disputes which arise from it; and
that China Direct cannot be compelled to arbitrate under the
theory that it is was "doing business as" CDII.[6]

The respondents also contend that this Court does not have
personal jurisdiction over them. "[A] federal court generally
may not rule on the merits of a case without first determining
that it has jurisdiction over . . . the parties." Sinochem
Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 549 U.S.
422, 430-31 (2007). But, "[w]hen a party agrees to arbitrate in
a state, where the [FAA] makes such agreements specifically
enforceable, that party must be deemed to have consented to the
jurisdiction of the court that could compel the arbitration
proceeding in that state." Doctor's Associates, Inc. v. Stuart,
85 F.3d 975, 979 (2d Cir. 1996) (citation omitted). Therefore,

---

included an arbitration agreement. In this context, the Second
Circuit has determined that the district court must consider
whether the charterers had even entered into the alleged charter
party in addressing the motion to compel arbitration. Id. at
676.

[6] It is appropriate to determine if nonparties to a contract
including an arbitration agreement may be bound to arbitrate at
the time when a motion to compel has been filed. McAllister
Bros., Inc. v. A & S Transp. Co., 621 F.2d 519, 523-24 (2d Cir.
1980) (remanding case to district court to determine, at the
time it resolved motion to compel arbitration, if "affiliated
enterprises" were bound to arbitrate even though they were not
signatories to the arbitration agreement); Fisser v.
International Bank, 282 F.2d 231, 233-34, 237-41 (2d Cir. 1960)
(determining, on a motion to compel arbitration, whether a non-
signatory to a charter party could be compelled to arbitrate on
a theory of alter ego liability).

in determining that CDII, but not China Direct, agreed to arbitrate this dispute, this Opinion also finds that CDII is subject to personal jurisdiction in this District.

II.  A Charter Party With An Agreement to Arbitrate Was Formed Between Sunskar and CDII.

"Notwithstanding the strong federal policy favoring arbitration as an alternative means of dispute resolution, courts must treat agreements to arbitrate like any other contract." U.S. Titan Inc., 241 F.3d at 146.  "A contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement.  A court must therefore examine the parties' written communications to determine whether they have formed an agreement to arbitrate." Id.

"As a maritime contract[,] a charter party is governed by maritime law and thus need not be in writing unless expressly so required by an applicable statute." Great Circle Lines, Ltd. v. Matheson & Co., Ltd., 681 F.2d 121, 124 (2d Cir. 1982) (citation omitted).

> [C]harter parties are formed in two stages.  First,
> significant "main" terms are negotiated through
> brokers.  These terms usually include the name of the
> charterer, name of owner, ship, and its
> characteristics, time and place of delivery, duration
> of charter, place of redelivery, hire rate, printed
> form upon which the contract is based, and any other
> term that a party deems important.  These are
> considered the "bare-bones" of the contract.  The
> "main" terms when agreed upon are entitled a
> "fixture."

U.S. Titan Inc., 241 F.3d at 149 (citation omitted).  This

fixture of main terms is a "binding agreement . . ., which is a

commitment that a voyage will be performed, and one which

presupposes a final contract, with main terms set, and final

details to be resolved subsequently."  Id. (citation omitted).

> Second, after a "fixture" has been reached, the
> parties continue to negotiate "details" amending the
> form contract specified in the "fixture."  These minor
> or side issues "flesh-out" the original agreement or
> fixture.  The "details" include a wide variety of
> matters, for example: fuel used, speed of vessel,
> condition of ship's holds, exact time of ship's
> delivery to charterer, brokerage, breakdown,
> bunkering, option to extend charter, cargo capacity,
> demurrage and whatever else is deemed by the parties
> to be of minor importance.

Id. at 149-50 (citation omitted).  Therefore, any failure of a

party to agree to a final form of a charter party, including all

minor terms -- for example, if a board of directors or

executives failed to ratify the charter party -- "would not

prevent or undo formation of the charter party.  Instead, the

failure . . . would constitute a breach of the charter party" by

that party.  Id. at 150.

A.  A Charter Party and Agreement to Arbitrate Were
    "Fixed."

The undisputed evidence shows that CDII and Sunskar agreed

to a fixture, which included an agreement to arbitrate, no later

than January 25, 2011.  Indeed, the fixture -- albeit without an

agreement to arbitrate disputes -- may have been agreed to as

24

early as January 20.  On January 19, Wold listed the main terms
which summarized his and Friedberg's conversations about the
Georgia and the Ore Shipment thus far.  Repeatedly, Friedberg
indicated assent to those terms.  Then, on January 20, Friedberg
and Wold agreed to a form charter party which could serve as the
basis for the details of the final Charter Party between CDII
and Sunskar.  Friedberg then added, for the first time, that he
still needed CDII executives to complete a final review of the
draft.  Wold explained to Friedberg, also not for the first
time, how charter parties become binding agreements when main
terms are "fixed," and asked Friedberg later if CDII agreed with
the main terms determined the day before.  Friedberg told him it
did, and the remainder of the conversation that day only
indicated that Friedberg needed to obtain approval on the form
contract terms -- i.e., the details.

      If a fixture had not been agreed upon by January 21, then a
fixture, including an agreement to arbitrate, was certainly
reached by January 25.  Friedberg explicitly told Wold that CDII
agreed to arbitration in New York around 1:00 p.m. on January
24.[7]  He also stated, repeatedly, that CDII agreed with all the

_____

[7]      In accordance with this agreement by Friedberg, clause
19(b) provides for arbitration in New York under federal
admiralty law.  But clause 19(a) provides that the Charter Party
will be governed by English law and that disputes should be
referred to arbitration in London.  This Opinion need not
confront this apparent ambiguity because the parties consented

other terms as discussed.  Wold continued to remind Friedberg
that the Georgia was already on CDII's account, and Friedberg
did not disagree.  Finally, although Friedberg did again raise
the issue of getting approval from CDII executives, he informed
Wold that he had been discussing the Charter Party with those
executives on both January 24 and 25.  Friedberg informed Wold
that he could not confirm agreement until speaking with
Goldrich, the vice president of CDII and China Direct.  Shortly
thereafter, Friedberg reported that he was about to speak with
the "VP," and just a little while later, stated unambiguously,
"this is to confirm that CDII Trading agrees that all the
information regarding the five points of the Charter Party is
amended and correct.  The Georgia-S Charter Party Laycan
February 15th-25th, 2011 of course.  All other terms in the
charter party mentioned above have been agreed upon."

     This evidences a clear agreement to be bound by the Charter
Party.  Indeed, in his declaration, Friedberg admits that he and
Wold negotiated the main points by January 25, and the
respondents concede this point in their opposition brief.  Under
maritime law as applied in this Circuit, such an agreement was
sufficient to bind CDII to the Charter Party, and, through a
clause in that Charter Party, to arbitrate disputes such as this

at the initial pretrial conference on July 1, 2011 that New York
was an acceptable forum should arbitration be compelled in this
matter.

one.  Beyond agreement to these main terms, CDII agreed to many
of the details of the Charter Party.  Furthermore, the actions
of Friedberg and other employees of CDII in the period between
January 25 and February 11 -- corresponding with Sunskar
(through Wold) about details of the Ore Shipment, acquiring ore
at Manzanillo, meeting with Wold in Manzanillo, and engaging in
somewhat frantic efforts to secure new sources of ore to meet
the 25,000 mt cargo quantity stated in the Charter Party -- are
evidence that they believed CDII to have obligations to perform
under the Charter Party.  Emails after January 25 between Wold
and CDII employees were entitled "mv georgia s/acct cdii,"
suggesting that they understood that the Georgia was on CDII's
account.

Respondents claim that the quantity and availability of the
cargo, which they allege are "main terms," were never fixed.  In
support, they cite to portions of the Skype transcript which
show the difficulties CDII was having securing cargo.  The
respondents do not address, however, that the 25,000 mt cargo
quantity term was clearly stated as early as January 19, agreed
to along with the other main terms they concede were negotiated
by Friedberg, and then repeatedly referenced by CDII employees
in the context of their efforts to secure alternate supplies of
ore to meet the amount required for loading onto the Georgia.

They also do not explain why the availability of the ore

27

should be considered a main term, or even a term at all, of a Charter Party.  No law is cited for the proposition that a ship owner cannot consider a contract binding unless and until a shipper of goods had already collected the goods at port; such a rule of law, if it existed, would significantly hamper commerce. It is not necessary, as respondents suggest, to have a trial to determine if availability of cargo was a "main term" in the opinion of the parties, both because they have already conceded that Friedberg negotiated the main terms with Wold and because they present no evidence raising a dispute of material fact that anyone believed this to be a main term -- the only evidence is that CDII clearly expressed its agreement to the Charter Party without such a reservation.[8]

The respondents also claim that because no one from CDII or China Direct ever signed the Charter Party, there was no meeting of the minds, and therefore no binding contract.  Their argument proposes that nothing other than a signature could be evidence of a meeting of the minds, ignoring law in this Circuit that "[a] court must . . . examine the parties' written

---

[8]    Wold's attempts to assist CDII in securing alternate sources of ore to meet the 25,000 mt requirement both from his office and once in Manzanillo does not help the respondents' argument that ore availability was a main term.  If anything, these efforts are evidence of Sunskar's desire to build a good relationship with CDII, protect their interests in the Charter Party and prevent possible losses if the Georgia were to sail from Manzanillo empty.

communications to determine whether they have formed an agreement to arbitrate," Titan, 241 F.3d at 146, and that "a charter party . . . need not be in writing." Great Circle Lines, 681 F.2d at 124 (citation omitted). Written communications via Skype provide unambiguous evidence of the parties' meeting of the minds over the Charter Party and, more specifically, the agreement to arbitrate.

    B.   Any Condition to CDII's Agreement Was Fulfilled.

The respondents next contend that the January 25 agreement to the terms of the Charter Party "did not obviate the requirements" that Friedberg had repeatedly informed Wold he needed to fulfill before CDII could be bound. These "requirements" were the approval of some of the senior executives of CDII. This argument relies on a generalization of the communications between Friedberg and Wold and a lack of specificity about the context and timing of when certain communications take place. While it is true that Friedberg did mention several times that he was not as senior as other executives at CDII, only on a few occasions did he connect this lack of seniority to the fact that he would need to get their approval for the Charter Party. On each occasion, he later related CDII's agreement to the terms. Most importantly, each time he referenced the need for senior executive approval came before the evening of January 25, when, after telling Wold that

he was about to speak to executives about the Charter Party, he then said in clear and unequivocal terms that CDII agreed to all the terms of the Charter Party.  The respondents present no evidence contradicting this clear contemporaneous statement that after Wold's discussion with senior executives, CDII was in agreement with the terms.  Indeed, the conduct of CDII after that point indicates that Friedberg received approval from the senior executives and that CDII was preparing to perform under the Charter Party.

C.   Friedberg Had Apparent Authority to Bind CDII.

The respondents claim that Friedberg lacked actual or apparent authority to agree to the Charter Party on behalf of CDII.  Both Rothstein and Friedberg state in their affidavits that he lacked actual authority, and Sunskar can point to no contradicting evidence.  But when one lacks actual authority,

> he may nonetheless bind his principal to a contract if
> the principal has created the appearance of authority,
> leading the other contracting party to reasonably
> believe that actual authority exists.  Apparent
> authority exists when a principal, either
> intentionally or by lack of ordinary care, induces a
> third party to believe that an individual has been
> authorized to act on its behalf.

Highland Capital Management LP v. Schneider, 607 F.3d 322, 328 (2d Cir. 2010) (citation omitted).  But, "[a] party cannot claim that an agent acted with apparent authority when it knew, or

should have known, that the agent was exceeding the scope of
[his] authority." Id. (citation omitted).

The undisputed evidence supports a finding that CDII
created an appearance, either intentionally or through lack of
care, that Friedberg had the authority to negotiate and agree to
contracts like the Charter Party.  CDII provided Friedberg with
a vice president's title, and allowed him to use this title in
his emails.  Friedberg was tasked by CDII with pursing
transportation for ore shipments, and with negotiating with Wold
not just about the Ore Shipment at issue here, but also about
shipments before and after these events.  Even if Friedberg did
not have the authority to bind CDII without input from senior
executives, it was clear that he had the authority to bind CDII
once he had the senior executives' approval -- meaning that he
could communicate CDII's agreement to brokers like Wold once he
got that approval.  The amount of time Friedberg spent in
communications with Wold, and the responses from other employees
of CDII, also indicate that Friedberg had this level of
authority, or that CDII allowed Wold to believe he did.
Furthermore, if CDII had not intended to create this appearance
of authority, it would have prevented Friedberg from having
similar negotiations with Wold after the collapse of the Charter
Party.

The respondents can point to no reason why Wold should have known that Friedberg was exceeding his scope of authority.  More importantly, neither Friedberg nor Rothstein state in their affidavits that what Friedberg actually did in his negotiations with Wold was unauthorized.[9]

III.  China Direct Is Not Bound To Arbitrate By the Carter Party.

Sunskar has declined to argue that China Direct is liable under an alter ego theory.  Nor does Sunskar allege that China Direct is liable under the other theories recognized in this Circuit under which a non-party might be compelled to arbitrate.[10]  Instead, it alleges only that China Direct was "doing business as" CDII.

---

[9]    The respondents allege that Wold misled the more inexperienced Friedberg in the negotiations of the Charter Party without explaining the relevance of that statement.  Whatever the reason it was made, this allegation is without foundation. Wold explained, and reiterated many times over, principles of maritime contract law, particularly how a Charter Party is formed.  The principles he discussed are in accord with the law articulated in this Opinion.  Friedberg repeatedly indicated his understanding of the law as explained by Wold.  Even if Wold had not attempted to educate Friedberg on these principles of maritime law, an amateur is just as bound by the customs and practices of an industry -- and indeed the law -- as a veteran. Stolt Tankers, Inc. v. Marcus Oil & Chemical, No. 01 Civ. 5291(DC), 2001 WL 1524473, at * 3 (S.D.N.Y. Nov. 29, 2001).

[10]   The Second Circuit "has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency."  Thomson-CF, S.A. v. Am. Arbitration Assoc., 64 F.3d 773, 776 (2d Cir. 1995) (citation omitted).  It has therefore "recognized a number of theories under which nonsignatories may be bound to the arbitration agreements of others . . . 1) incorporation by

The words "doing business as" or the abbreviation d/b/a indicate that the name following is an assumed name.  Black's Law Dictionary (9th ed. 2009).  Thus, in the absence of any meaningful explicatory briefing by Sunskar on its theory for China Direct's liability, it appears that by alleging that China Direct was "doing business as" CDII, Sunskar means to say that China Direct assumed the name CDII as a form of trade name in its business affairs, and was therefore directly liable for the actions it took and contracts it agreed to under the name CDII.  Sunskar has alleged (and respondents do not dispute) that CDII is a separate and distinct legal entity from China Direct, albeit wholly owned by it.  But Sunskar's theory does not rely on the fact that there was actually a true legal entity named CDII.  The "doing business as" theory is that China Direct negotiated with Sunskar under the name of CDII, became the charterer under the Charter Party, and failed to perform, and so should be liable despite its use of an alternate name.

There is no evidence in the record to support a contention that China Direct, under the name CDII, is the actual charterer under the Charter Party.  Friedberg, the main contact in negotiating the Charter Party, is an employee of the legal entity CDII, and there is no evidence that he ever suggested

reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel."  Id.

otherwise.  Friedberg's email signature even specified that he was an employee of "CDII Trading - Subsidiary of China Direct." Although Friedberg sent one email claiming to represent China Direct, this email still displayed his email signature clearly indicating his employer, and stated that it was China Direct's wholly owned subsidiary, CDII, and not China Direct, which was in the process of locating ore.

The other employees that interacted with Wold in connection with the Ore Shipment were CDII employees (such as Berkowitz and Manuel Perez) or employees of both CDII and China Direct (the senior executives).  There is no indication that these individuals were working on behalf of China Direct in these interactions.  The fact that Wold received two emails that included form email signatures indicating Friedman and Goldrich's titles as China Direct executives is insufficient to show that they were contacting him as employees of China Direct working under the name of CDII.  Nothing in the Charter Party suggests that the CDII listed as Charterer is actually China Direct.  The fact that China Direct and CDII share offices, and some executives, is also not evidence that China Direct was doing business as CDII in its business with Sunskar.  There is therefore no basis to conclude that China Direct, doing business as CDII, agreed to be bound to arbitrate, or can be found to be bound to arbitrate, under the Charter Party.

CONCLUSION

Sunskar's July 13 motion to compel is granted in so far as it seeks to compel CDII to arbitrate. The motion is denied in so far as it seeks to compel China Direct to arbitrate. This action is stayed pending completion of the arbitration.

Dated:      New York, New York
            November 3, 2011

                          _____
                          DENISE COTE
                  United States District Judge